UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Justin Russell,

     Plaintiff,

          v.

Jason Scott,

     Defendant.

Civil Action No. 5:20–cv–184

## REPORT AND RECOMMENDATION
(Doc. 48)

Plaintiff Justin Russell, formerly a pretrial detainee at the Southern State Correctional Facility (SSCF), brings this lawsuit against Defendant Jason Scott, a corrections officer at SSCF during the relevant period. Russell alleges that Scott: (1) sexually assaulted him while Scott was overseeing a medication call at SSCF, (2) slammed a door on Russell after the sexual assault, and (3) falsely accused Russell of diverting medication in an attempt to cover up the assault. Russell sues Scott under 42 U.S.C. § 1983 for violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution, and supplemental claims of intentional infliction of emotional distress (IIED), malicious prosecution, and assault under state law.

Scott has filed a Motion for Summary Judgment, requesting that the Court dismiss all claims against him. (Doc. 48.) For the reasons explained below, I recommend granting the Motion with respect to the Eighth Amendment claim, the Fourteenth Amendment excessive force claim, and the IIED and malicious prosecution claims. I recommend that the Motion be denied as to the constitutional sexual assault claim. In addition, I recommend that the Court permit amendment of the Complaint to substitute a battery claim for the assault claim. If the

Court permits the amendment, I also recommend that the Motion for Summary Judgment be denied as to the battery claim.

<u>**Background Facts and Procedure**</u>

The following facts are principally derived from the parties' Statements of Undisputed Material Facts and the documents referenced therein. (*See* Docs. 48-1, 49-1.) Where the facts conflict, the Court draws all factual inferences in favor of Russell, as the non-moving party, in accordance with the applicable standard on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that on summary judgment "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

In February 2019, Russell was a pretrial detainee in the custody of the Vermont Department of Corrections (DOC) at SSCF in Springfield, Vermont. He was participating in a medication assisted treatment (MAT) program, which involved his regular receipt of Suboxone during scheduled "medication pass[es]"[1] at the facility. (Doc. 48-1 at 2, ¶¶ 7–8.) On the morning of February 11, Scott was the SSCF corrections officer on duty during Russell's medication pass. When Russell entered the room where the medication pass was to occur, Scott asked Russell to remove his hat from his head per SSCF policy, and Russell complied. A nurse administered Suboxone to Russell, and Scott confirmed that the medication was under Russell's tongue. Pursuant to prison policy, Russell was then seated for ten minutes to allow the Suboxone to dissolve. According to Scott, as Russell waited, another inmate who had just received his medication walked in front of Russell and stopped for a moment, preventing Scott from seeing either the inmate's or Russell's face. (*Id.* ¶ 13.) Russell contests this fact, stating that it "is complete utter crap" that "somebody was . . . in [Scott's] way of seeing me" during the

---

[1] According to Scott, medication passes are "conducted by health care staff for the purpose of providing a variety of medications to inmates." (Doc. 48 at 1, n.1.)

medication pass. (Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 100:20–23.) Notwithstanding

Russell's disagreement with this fact, Scott claims that his momentary inability to see Russell

and the other inmate's faces during the medication pass caused him to suspect that Russell was

attempting to smuggle Suboxone into SSCF. (Doc. 48-5 (Ex. C), Scott depo., at 16:1–19.)

After waiting the required ten minutes, Russell stood up for his mouth check, placing his

hat in the waistband of his sweatpants. Scott conducted the mouth check, confirming that

Russell's mouth appeared to be clear of medication. According to Scott, he then removed the hat

from Russell's waistband and told him to return to his unit. (Doc. 48-1 at 3, ¶ 17.) Scott further

claims that, after telling Russell to return to his unit, he inspected Russell's hat and found what

appeared to be crushed medication in it, resulting in Scott filing an Incident Disciplinary Report

against Russell for misuse of prescribed medication. (*Id.* ¶¶ 18, 21; *see* Doc. 48-6 (Ex. D),

2/11/19 Incident Disciplinary Report.) After a hearing a few weeks later, Russell was found not

guilty based on Scott's failure to retain chain of custody over the alleged contraband in Russell's

hat. (*See* Doc. 48-12 (Ex. J), 2/19/19 Incident Hearing Report, at 2.)

Russell's version of the facts, from after the point of Scott conducting the final mouth

check of Russell, is quite different. First, Russell denies that there was any contraband in his hat,

arguing that Scott filed the Incident Disciplinary Report to try to cover up his own unlawful

conduct. (Doc. 49-1 at 3–4, ¶¶ 14, 18.) Further, Russell claims that after completing his final

mouth check, Scott told Russell to stop. When Russell stopped and turned around to face Scott,

Scott grabbed the hat that Russell had tucked into his waistband, and then—in plain view of at

least two other inmates—reached into Russell's pants and grabbed, squeezed, and twisted

Russell's penis.[2] (*Id.* at 8, ¶ 35.) According to Russell's version of events, Scott then told

---

[2] Scott denies that he grabbed Russell's penis, stating at his deposition that he does not recall coming into contact with Russell's body in any manner when he grabbed Russell's hat. (Doc. 48-5 (Ex. C), Scott depo., at 19:15–21, 29:7–15.)

Russell to give him the hat, despite Scott already having the hat in his possession. (*Id.*) Scott's handling of Russell's penis in front of other inmates caused Russell a great deal of pain and embarrassment, and he reacted by quickly pulling away from Scott, and yelling and cursing at Scott in a hostile manner. According to Russell, as he walked back towards his unit in compliance with Scott's order, Scott "approached [Russell], his face contorted with anger, and stated 'How'd you like that, mother fucker?'"[3] (*Id.* at 9, ¶ 36.) Scott then slammed a heavy metal door on Russell's right arm, injuring Russell.

Russell claims that he had a rug burn and a red mark on his penis for about a week after the sexual assault, and then experienced scabbing on his penis. He further contends that he had a big bruise and broken blood vessels on his arm as a result of the door-slamming incident. Though Russell testified at his deposition that he asked to see a nurse on the date of the alleged sexual assault and door-slamming incident (*see id.* at 7, ¶ 28), he did not receive any medical attention for his physical injuries, and they resolved within about a week.

On November 9, 2020, Russell filed the Complaint in this action, alleging violations of his constitutional rights under the Eighth and Fourteenth Amendments, IIED, malicious prosecution, and assault. (Doc. 1.) The Complaint seeks compensatory and punitive damages, along with attorney fees, costs, and interest. (*Id.* at 6.)

On April 28, 2023, Scott filed a Motion for Summary Judgment (Doc. 48), a Statement of Undisputed Material Facts (Doc. 48-1) and supporting evidence (Docs. 48-3 through 48-17). Scott seeks dismissal of all claims, arguing that they fail as a matter of law for the following reasons: (a) Russell cannot establish a constitutional claim because Scott's conduct was not sufficiently serious or objectively unreasonable, and Russell's injuries were *de minimis*;

---

[3] Scott denies that he made this statement to Russell. (Doc. 48-5 (Ex. C), Scott depo., at 23:17–18.)

(b) Russell cannot establish a claim for IIED because Scott's conduct was not extreme and outrageous, and there is no evidence that Russell suffered severe emotional distress; (c) Russell cannot establish a claim for malicious prosecution because it is undisputed that Scott believed Russell was attempting to divert contraband at SSCF; (d) Russell cannot establish a claim for assault because Scott did not intend to harm him, and the alleged harm was incidental to Scott's duty to prevent misuse of medication and maintain order at a prison facility; and (e) Scott is entitled to qualified immunity on all claims because the alleged conduct did not violate a clearly established right, and even if it did, it was objectively reasonable for Scott to believe that his actions did not violate any clearly established right.

Russell filed an Opposition to Scott's Motion for Summary Judgment (Doc. 49), and a Statement of Disputed Material Facts (Doc. 49-1) and supporting evidence (Docs. 49-3 through 49-9). Russell argues that the Motion fails because he has denied, both at his deposition and in his verified Complaint, that he was attempting to divert contraband at SSCF. Therefore, in his view there is a triable issue of material fact precluding summary judgment. (Doc. 49 at 1.) Moreover, Russell contends that, construing the facts in his favor as required "there is no basis to conclude" that Scott's act of grabbing, squeezing, and twisting Russell's penis was done in furtherance of a legitimate search. (*Id.* at 10.) According to Russell, it is clearly established in this Circuit that no amount of gratuitous or sexually motivated fondling of an inmate's genitals is permitted by the Constitution, and therefore Scott is not entitled to qualified immunity. (*Id.*) Regarding the state-law claims of IIED and malicious prosecution, Russell asserts that there are issues of material fact that must be resolved by a jury at trial. (*Id.* at 11–12.) Finally, Russell abandons his assault claim, requesting leave to amend the Complaint to "rename" that claim as a claim for battery, which he contends survives summary judgment. (*Id.* at 12.)

In his Reply to Russell's Opposition, Scott contends that Russell misconstrues Second Circuit caselaw regarding the standard for a sexual abuse claim under the Fourteenth Amendment, and further contends that Russell fails to identify any genuine dispute of material fact precluding summary judgment. (Doc. 52.) Regarding Russell's proposal to amend the Complaint to replace the assault claim with a battery claim, Scott argues that Russell "has offered no evidence to support" a battery claim. (*Id.* at 10.)

## Analysis

### I.    Standard of Review

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* Factual disputes that are "irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Id.* If the moving party demonstrates that there are no genuine issues of material fact, the burden shifts to the nonmoving party, who must present "'significantly probative supporting evidence' of a disputed fact." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (quoting *Anderson*, 477 U.S. at 249). Where the nonmoving party "'fail[s] to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim on which the [nonmoving party] bears the burden of proof," the moving party is entitled to summary judgment. *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

In considering a motion for summary judgment, the court is "required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant." *Robinson v. Concentra*

*Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted); *see SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) ("party against whom summary judgment is sought [must be] given the benefit of all permissible inferences and all credibility assessments").  But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  He "cannot defeat summary judgment by relying on the allegations in his complaint, conclusory statements, or mere assertions that affidavits supporting the motion are not credible."  *Hamlett*, 496 F. Supp. 2d at 328 (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see Dasher v. N.Y.C. Police Dep't*, No. 94 CV 3847(SJ), 1999 WL 184118, at *1 (E.D.N.Y. Mar. 18, 1999) ("[T]he court should grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not significantly probative.").

The court's role in adjudicating a motion for summary judgment "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

## II.    Section 1983 Claims

Russell brings this action, in part, under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state actors from using the badge of their

authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To succeed on a § 1983 claim, a plaintiff must establish that: "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)).

In this case, Russell seeks redress for the alleged deprivation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution "to be free from cruel and unusual punishment . . . [and] from unjustifiable assault and sexual assault by correctional officers." (Doc. 1 at 6, ¶ 33.)

### A.    Eighth Amendment

Russell was a pretrial detainee during the relevant period. The Eighth Amendment's "cruel and unusual punishment" proscription does not apply to him because he could not be "punished" as a pretrial detainee. *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that where "there had been no formal adjudication of guilt" against pretrial detainee at time he required medical care, "Eighth Amendment has no application"). Similarly, the Second Circuit has explained that because pretrial detainees "have not been convicted of a crime," they "may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (internal quotation marks omitted).

Accordingly, as the Eighth Amendment does not apply to pretrial detainees, summary judgment should be granted in Scott's favor on Russell's Eighth Amendment claim.

### B.    Fourteenth Amendment

Although the Eighth Amendment does not apply to pretrial detainees, the rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quoting *City of Revere*, 463 U.S. at 244). Pretrial detainees are thus not without recourse to complain about excessive force or other abuse by prison officials. Such claims "are governed by the Due Process Clause of the Fourteenth Amendment," which affords pretrial detainees an equal or higher level of protection than the Eighth Amendment affords prisoners.[4] *Id.*; *see Rhem v. Malcolm*, 507 F.2d 333, 336, 337 (2d Cir. 1974) ("Pre-trial detainees do not stand on the same footing as convicted inmates" but are "entitled to protection from cruel and unusual punishment as a matter of due process."); *Brown v. City of New York*, CIVIL ACTION NO. 21 Civ. 4632 (PGG) (SLC), 2023 WL 2908661, at *6 (S.D.N.Y. Jan. 30, 2023) ("'[A] pre-trial detainee's constitutional rights are at least as great as those of a prisoner,' and thus the protections under the Fourteenth Amendment Due Process Clause 'are coextensive with those afforded by the Eighth Amendment.'" (alteration in original) (quoting *Jean-Laurent*, 438 F. Supp. 2d at 324)), *report and recommendation adopted*, 2023 WL 2496089 (Mar. 14, 2023); *Est. of Rodriguez v. Simon*, No. 2:06–CV–125, 2007 WL 2154238, at *3 (D. Vt. Mar. 30, 2007) ("The Eighth Amendment . . . applies only to persons convicted of crimes, while the rights of pre[]trial detainees are protected by the Fourteenth Amendment."), *report and recommendation adopted sub nom. Rodriguez v. Simon*, 2007 WL 2107542 (July 19, 2007).

---

[4] "[A] person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody." *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009), *overruled on other grounds by Darnell*, 849 F.3d at 34–35.

1.    **Excessive Force Claim**

a.    **Governing Legal Standards**

Russell claims that Scott violated his constitutional rights by "slamm[ing] a door hard on [his] right arm," causing him injury.  (Doc. 49-1 at 9, ¶ 36.)  The Fourteenth Amendment's Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)); *see Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) (holding that "pretrial detainees . . . rely on the [Fourteenth Amendment's] constitutional guarantee of due process" as the source of an excessive force claim (internal quotation marks omitted)).  A corrections officer's actions may amount to punishment if they are taken with "an expressed intent to punish," or if they are not "reasonably related to a legitimate governmental objective." *Bell v. Wolfish*, 441 U.S. 520, 538, 539 (1979).  In *Kingsley*, the Supreme Court held that "a pretrial detainee can prevail [on an excessive force claim against a corrections officer] by providing *only objective evidence* that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 576 U.S. at 398 (emphasis added); *see Edrei*, 892 F.3d at 537 ("*Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment . . . .").  In other words, where the plaintiff is a pretrial detainee, the court need not take into account the defendant corrections officer's "state of mind" when deciding whether the alleged force was "excessive." *Kingsley*, 576 U.S. at 396.

In determining whether a corrections officer used excessive force against a pretrial detainee, the factfinder must apply an "objective reasonableness" standard that "turns on the facts and circumstances of each particular case." *Id.* at 397 (internal quotation marks omitted). This standard should be applied "from the perspective and with the knowledge of" the officer,

*id.* at 399, and it should account for "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," *id.* at 397. The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* at 399–400.

In addition to considering whether the force used against a pretrial detainee was "objectively unreasonable," the court generally must find that the force was "either 'more than *de minimis*' or 'repugnant to the conscience of mankind.'"[5] *Lewis v. Huebner*, No. 17-CV-8101 (KMK), 2020 WL 1244254, at *5 (S.D.N.Y. Mar. 16, 2020) (quoting *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999)); *see Baltas v. Dones*, Case No. 3:22-CV-38 (MPS), 2022 WL 1239989, at *10 (D. Conn. Apr. 27, 2022) ("A *de minimis* use of force will rarely be sufficient to satisfy the objective element [of an Eighth Amendment excessive force claim] unless that force is also repugnant to the conscience of mankind." (internal quotation marks omitted)). Where the court finds that the alleged force was *de minimis*, it may dismiss a pretrial detainee's (or a prisoner's) excessive force claim on that ground. *See, e.g.*, *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 256 (2d Cir. 2020) (affirming dismissal of pretrial detainee's excessive force

---

[5]  In Fourteenth Amendment excessive force cases, courts consider Fourth and Eighth Amendment excessive force cases instructive when determining what constitutes *de minimis* force, or force that is reasonable under the circumstances, even though the protections offered by the Fourth, Eighth, and Fourteenth Amendments differ materially. *See Casiano v. Ashley*, 515 F. Supp. 3d 19, 25 (W.D.N.Y. 2021) ("The standards applicable to . . . a [pretrial detainee's Fourteenth Amendment] claim[s] are largely the same as those applied to [a pretrial detainee's] Fourth Amendment claims.  Both relate to the objective reasonableness of the defendants' use of force; there is no 'subjective' element, as with Eighth Amendment claims."); *Edrei*, 892 F.3d at 542 n.5 (noting "the practice of the Supreme Court and th[e Second] Circuit . . . [to] cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts" when considering excessive force claims); *Darnell*, 849 F.3d at 34 (explaining that Eighth Amendment cases are relevant to Fourteenth Amendment claims insofar as "they address the practical importance of taking into account the legitimate safety-related concerns of those who run jails").

claim, explaining that "although perhaps the struggle between [the pretrial detainee] and the officers could have been gentler, the video footage does not suggest that the officers' actions could reasonably be viewed as excessive" (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [detainee]'s constitutional rights."))); *Lynch v. City of New York*, 952 F.3d 67, 77 (2d Cir. 2020) (affirming dismissal of pretrial detainee's excessive force claim because "there is 'a *de minimis* level of imposition with which the Constitution is not concerned,'" and thus holding that protestor who was detained for five hours while being denied food, drink, and access to a bathroom failed to state claim) (quoting *Bell*, 441 U.S. at 539 n.21)); *Hart v. Suffolk County*, 17-CV-05067 (LGD), 2023 WL 5720075, at *20 (E.D.N.Y. Sept. 5, 2023) (holding corrections officer's act of escorting pretrial detainee down prison corridor, which entailed "merely h[olding] Plaintiff's elbow for approximately thirty seconds while guiding her down the medical corridor," was "not even remotely actionable"); *Costanzo v. Santacroce*, 16-CV-03871 (JMA) (ARL), 2023 WL 4247636, at *3 (E.D.N.Y. June 29, 2023) (finding pretrial detainee failed to prove excessive force where evidence showed prison workers merely used "*de minimis* force to guide" her and to "prevent her from falling" during escort from medical unit in prison); *Bragdon v. Baccus*, No. 3:20-cv-258 (JAM), 2020 WL 2113606, at *3 (D. Conn. May 4, 2020) (dismissing excessive force claim where prisoner alleged "some irritation and swelling" on his wrist and ankles, "without any suggestion of significant pain or that the injury was more than *de minimis*" (internal quotation marks omitted)); *McGarrell v. Arias*, 18 Civ. 2273 (GBD)(HBP), 2019 WL 2528370, at *4 (S.D.N.Y. Mar. 1, 2019) (holding pretrial detainee failed to state excessive force claim where he sustained only minor injuries, including "swelling and a cut that caused bleeding," after being handcuffed for short period of time: "tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort and

bruising" (internal quotation marks omitted)), *report and recommendation adopted*, 2019 WL 1254880 (Mar. 19, 2019); *Santiago v. City of Yonkers*, No. 13–CV–1077 (TPG), 2015 WL 6914799, at *8 (S.D.N.Y. Oct. 30, 2015) (explaining, in context of Fourth Amendment claim, that "an open-handed slap on the back of the head, with no medical evidence and no other evidentiary support of injury, does not rise to the level of a constitutional violation" (internal quotation marks omitted)).

Nevertheless, even when a corrections officer's use of force against a pretrial detainee is found to be *de minimis*, it may be considered "excessive"—and therefore rise to the level of a constitutional violation—if it is found to be "entirely gratuitous." *Ben-Reuben v. Westchester County*, No. 17-CV-9156 (KMK), 2019 WL 1406868, at *3 (S.D.N.Y. Mar. 28, 2019); *see id.* at *1, 3 (declining to dismiss Fourteenth Amendment excessive force claim based on corrections officer's alleged act of smacking pretrial detainee across face, given allegation in complaint that use of force was "a malicious and sadistic effort to harm [pretrial detainee]") (internal quotation marks omitted)); *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (noting that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury").

### b.    Analysis

Russell's excessive force claim is based on the allegation that Scott "slammed a door hard on Mr. Russell's right arm, injuring Mr. Russell." (Doc. 49-1 at 9, ¶ 36; *see* Doc. 1 at 2, ¶ 10.) In his Opposition to Scott's Motion for Summary Judgment on this claim, Russell states only that "[Scott] slammed a heavy metal door on Mr. Russell's arm, pinching, bruising[,] and otherwise injuring him." (Doc. 49 at 2.) Russell's deposition testimony demonstrates the lack of a triable factual issue on this claim.

First, Russell essentially testified that the injuries he suffered resulting from the door-slamming incident were minor.  Specifically, he stated that he had "a big bruise" on his forearm, with a "nasty pinch" in the middle of it and "broke[n] . . . blood vessels."  (Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 105:6–10.)  Russell stated that the bruise hurt him for about a week (*id.* at 105:15–16) and started resolving in about "[f]ive to seven days" (*id.* at 105:25).  He testified that he did not request medical attention after the door-slamming incident.  (*Id.* at 104:15–23.)  In addition, Russell described the door-slamming incident as Scott merely "grabb[ing] the door, and . . . shut[ting] the door," while Russell's leg, foot, and arm were "in the door"; and "instead of getting [his] foot chopped off" by the door, Russell "put [his] arm up . . . as a defense tactic," and his arm "got jammed in[] between the door and the frame as [the door] shut."  (*Id.* at 90:11–16.)  Comparing Russell's injuries to the decisions above where courts have found the force used and resulting injuries to be *de minimis*, I find that this level of force and resulting injury do not rise to a constitutional level.  Moreover, Russell has not submitted evidence demonstrating that Scott's slamming the door was "entirely gratuitous" or "repugnant to the conscience of mankind."  *Ben-Reuben*, 2019 WL 1406868, at *4 (holding that courts are "hesitant to dismiss excessive force claims even where no serious injuries are alleged if the use of force alleged was entirely gratuitous" (internal quotation marks omitted)); *Lewis*, 2020 WL 1244254, at *5 (holding that claims for excessive force "must involve force that is either more than *de minimis* or repugnant to the conscience of mankind" (internal quotation marks omitted)).

Second, considering the facts in conjunction with the legitimate interests in managing and maintaining order in a jail, Russell has not presented evidence sufficient to create triable issues of material fact as to the objective reasonableness of the force Scott used in slamming the door.  Russell admitted during deposition that, after the alleged sexual assault occurred and Scott ordered Russell to "go back to [his] unit," Russell initially complied, but then "stopped in the

corridor" and "yell[ed]" at Scott because he was "upset" about the alleged sexual assault.  (Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 89:23, 90:6, 10; 91:7.)  Russell testified that, in that moment, he "fit the description of being a hostile inmate."  (*Id.* at 99:13–14.)  Specifically, Russell stated that he was "shouting at" Scott (*id.* at 97:19–21), and "cursing at" and "back-talking" to Scott (*id.* at 99:24–100:2), and that he was "irate" and "[not] in a good state of mind" such that he "could understand [Scott] locking [him] in" (*id.* at 98:20–23).  (*See also id.* at 38:7, 9–10 (Russell stating that he was "giving [Scott] a piece of my mind, yelling at him, . . . yelling obscenities"), 93:19–22 (Russell stating that he was "[s]creaming obscenities" and "yelling" at Scott, and that he was "upset" after the alleged sexual assault); Doc. 49-8 (Ex. 6), Bedard Aff., at 2[6] and Doc. 49-9 (Ex. 7), Tarbell Aff., at 3 (inmates Bedard and Tarbell stating that "Mr. Russell started to yell and curs[e] at CO Scott," and that, "Mr. Russell [was] still protesting while slowly walking to the double door sally port").)  Likewise, in an Incident Report prepared on the date of the incident, Scott stated that after he found medication in Russell's hat, Russell "used profanity calling me a 'fucking asshole,'" and Scott was required to "escort[] [Russell] to [his] unit . . . because of the numerous instructions to return to the unit that were not followed."  (Doc. 48-7 (Ex. E), 2/11/19 Incident Report.)

Russell concedes that he was upset and yelling at Scott as he was returning to his unit as Scott ordered.  He fails to present evidence demonstrating that Scott's handling of the door was punitive rather than an action taken to confirm that Russell was complying with the order to return to his unit without incident.  Given Russell's admitted profanity-laced speech towards Scott, irate temperament, and act of stopping as he was walking back to his unit in response to

---

[6] Where the CMECF page numbers for an exhibit differ from the document's actual page numbers, the Court cites the actual page numbers of the document, excluding the cover page.  For example, although the CMECF page number on the first page of Joshua Bedard's Affidavit (marked as Exhibit 6) is "Page 2 of 4," the Court refers to it as page 1.  Similarly, although the CMECF page number on the seventh page of Russell's continued deposition (marked as Exhibit 2) is "Page 3 of 31," the Court refers to it as page 7.

Scott's order, there is no triable issue on this record that, from Scott's perspective, Russell represented a security threat.  Therefore, Scott's act of forcibly closing the door as Russell walked through it was objectively reasonable.  *See, e.g.*, *Frost*, 980 F.3d at 256 ("Given the severity of the security problem at issue; the threat reasonably perceived by the officer[s]; and [the fact that the pretrial detainee] was actively resisting, defendants were justified in using nontrivial amounts of force." (alterations in original) (citation and internal quotation marks omitted)); *Costanzo*, 2023 WL 4247636, at *8 (finding no excessive force where evidence showed that "[pretrial detainee] was severely agitated, behaving erratically, and verbally abusive towards [prison] staff; that [prison staff] employed only *de minimis* physical force as they escorted [detainee] from the medical unit to the female property unit; and that [detainee] was uninjured when [prison staff] deposited her at the female property unit"); *Casiano*, 515 F. Supp. 3d at 26 ("Given [pretrial detainee's] steadfast refusal to comply with the deputies' directives, it was objectively reasonable for them to enter the room and to use some force to get her to comply with their commands."); *Carmona v. City of New York*, 13cv3273, 2016 WL 4401179, at *3 (S.D.N.Y. Mar. 1, 2016) ("[C]ourt officers do not have the ability to know what a pre[]trial detainee is thinking (which is, in any event, not relevant to the merits of the pre[]trial detainee's excessive-force claim)[; r]ather, a court officer's decision to use force must be made from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." (internal quotation marks omitted)).

In reaching this conclusion, I have taken into account the interaction between Scott and Russell immediately prior to the door incident, the relationship between the need for Scott to use force to close the door after Russell walked through it and the amount of force Scott actually used to close the door, any threat that Russell may have posed to prison security as reasonably perceived by Scott, and the extent of Russell's injury as a result of Scott's act of forcibly closing

the door.  Considering all the facts and circumstances from the perspective of a reasonable officer on the scene facing these circumstances, and accounting for the jail officials' legitimate need to preserve order and discipline and maintain institutional security at detention facilities, I am unable to find that Scott's conduct was objectively unreasonable.  *See Kingsley*, 576 U.S. at 396–99.

For these reasons, even after resolving all ambiguities and drawing all factual inferences in favor of Russell, I find that Russell raises no genuine dispute of material fact as to whether Scott's use of force in slamming the door as Russell walked through it was reasonable.  I therefore recommend granting summary judgment in Scott's favor on Russell's excessive force claim.

### 2.    Sexual Assault Claim

Russell's sexual assault claim is based on his allegation that Scott "reached down Mr. Russell's pants and grabbed and squeezed and twisted his penis," causing Russell "a great amount of pain" "secondary to . . . shock and mortification."  (Doc. 1 at 2, ¶¶ 8, 9.)  Given Russell's status as a pretrial detainee, the Fourteenth Amendment Due Process Clause governs Russell's sexual assault claim.  *See Darnell*, 849 F.3d at 29; *see also Ojo v. Hillsborough Cnty. Dep't of Corr.*, Civil No. 12-CV-204-SM, 2012 WL 4513944, at *2 (D.N.H. Sept. 25, 2012) ("The Fourteenth Amendment protects a pretrial detainee from unwanted sexual contact by prison officials[; s]uch a claim may be analyzed by analogy to the legal standards governing excessive force claims."), *report and recommendation approved*, 2012 WL 4514005 (Oct. 2, 2012).

It is unclear in this Circuit whether pretrial detainees' Fourteenth Amendment claims of sexual abuse require application of an objective standard only, as in excessive force claims under *Kingsley*.  *See Lynch v. County of Herkimer*, 9:20-CV-63 (BKS/ATB), 2022 WL 866745, at *9

(N.D.N.Y. Feb. 16, 2022) ("[C]ourts in this Circuit have noted that it is not yet clear whether a pretrial detainee's sexual abuse claim under the Fourteenth Amendment—as opposed to an excessive force claim—is subject to an objective or subjective *mens rea* requirement."), *report and recommendation adopted*, 2022 WL 866253 (Mar. 23, 2022); *Lewis*, 2020 WL 1244254, at *9 ("[I]t is presently unclear whether both prongs required for Eighth Amendment sexual abuse claims are also required for claims of sexual abuse under the Fourteenth Amendment." (internal quotation marks omitted)); *Holland v. City of New York*, 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016) ("[I]t is unclear whether, post-*Kingsley*, the sexual abuse claims of a pretrial detainee must still meet both the objective and subjective prongs of the traditional Eighth Amendment analysis . . . .").

Given the uncertainty as to the governing standard, the analysis below considers Russell's sexual abuse claim under both the Eighth Amendment and Fourteenth Amendment standards, ultimately concluding that Russell has adduced sufficient evidence to raise a dispute of material fact under either standard.  *See, e.g.*, *Gilliam v. Black*, Case No. 3:18cv1740 (SRU), 2019 WL 3716545, at *10 (D. Conn. Aug. 7, 2019) (concluding that, "under either the Eighth Amendment standard set forth in *Crawford* that involves both objective and subjective prongs or under the Fourteenth Amendment post-*Kinglsey* excessive force standard that involves only an objective prong, [pretrial detainee's] allegations state a plausible claim of sexual abuse").

### a.    Eighth Amendment Analysis

As the Second Circuit has explained, "[b]ecause sexual abuse [of an inmate] by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims."  *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997).  The conduct in *Boddie* included a female corrections officer making a pass at the inmate, squeezing his hand, touching his penis, calling

him a "sexy black devil," "bumping into [his] chest with both her breast[s]," and bumping into him "with her whole body [including her] vagina against [his] penis." *Id.* at 860 (first alteration in original) (internal quotation marks omitted). The Second Circuit held that "[n]o single incident" of sexual abuse alleged was "objectively, sufficiently serious," nor were the incidents "cumulatively egregious" enough to meet the objective prong of the Eighth Amendment standard, *id.* at 861 (internal quotation marks omitted). The court explained that although "[t]he isolated episodes of harassment and touching alleged by [the inmate] are despicable," they "do not involve a harm of federal constitutional proportions." *Id.*

The Second Circuit subsequently clarified its opinion in *Boddie* to reflect evolved "contemporary standards of decency." *Crawford v. Cuomo*, 796 F.3d 252, 259 (2d Cir. 2015) (explaining that "particular conduct that might not have risen to the level of an Eighth Amendment violation [eighteen] years ago may no longer accord with community standards, and for that reason may state a claim today."); *see id.* at 254 ("[W]e recognize that sexual abuse of prisoners, once passively accepted by society, deeply offends today's standards of decency."). *Crawford* held that "a single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights no less than repetitive abusive conduct." *Id.* at 257. A prison official's sexual abuse of an inmate may be serious enough to implicate the Constitution even where there are no allegations of "penetration, physical injury, or direct contact with uncovered genitalia." *Id.*; *see DeJesus v. Lewis*, 14 F.4th 1182, 1199 (11th Cir. 2021) ("We treat sexual assault cases differently [than excessive force cases] because sexual assault is never acceptable under contemporary standards of decency[; t]hus, when the sexual assault occurs it is necessarily constitutionally excessive in violation of the Eighth Amendment.").

In order to state an Eighth Amendment claim arising from sexual abuse by a prison official, the prisoner must allege that: (1) "the defendant acted with a subjectively 'sufficiently culpable state of mind'"; and (2) "the [defendant's] conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford*, 796 F.3d at 256 (quoting *Hudson*, 503 U.S. at 8). "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* at 257. The "principal inquiry" is "whether the contact [with an inmate's genitalia or other intimate area] is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

In the absence of an inference that the prison official's alleged conduct served a legitimate penological or law enforcement purpose, "the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Id.* at 257 n.4 (citing *Boddie*, 105 F.3d at 861). *Crawford* found that inmates Thaddeus Corley and James Crawford had adequately pled Eighth Amendment violations. Specifically, the court found that allegations that a corrections officer had "fondl[ed] and squeeze[d] [inmate Corley's] penis in order to make sure [he] did not have an erection" rose to the level of an Eighth Amendment violation. *Id.* at 258 (internal quotation marks omitted). The court explained that "[t]here is no penological justification for checking to see if an inmate has an erection," and noted that the alleged "frisk" was conducted "in the middle of Corley's visit with his wife." *Id.* The timing and the reason given for the frisk together suggested that "the frisk was pretext for sexual abuse." *Id.* Likewise, allegations that the same corrections officer "squeezed and fondled [inmate Crawford's] penis and roamed his hands down Crawford's thigh," were sufficient to state a valid Eighth

Amendment claim. *Id.* (internal quotation marks omitted). The court noted that the corrections officer's demeaning comments and taunts to Crawford during and after his "extensive search of Crawford's genitalia" suggested that the officer "undertook the search in order to arouse himself, humiliate Crawford, or both." *Id.* at 258–59; *see Shepherd v. Fisher*, No. 08-CV-9297 (RA), 2017 WL 666213, at *18 (S.D.N.Y. Feb. 16, 2017) ("To determine the purpose of a correction officer's conduct during a frisk, the Second Circuit has looked to the timing of the frisk, the comments made during the frisk, and subsequent comments made by the officers.").

Although Scott denies having touched Russell's penis at all,[7] he argues that the alleged conduct—including grabbing, squeezing, and twisting Russell's penis—was "incidental to a legitimate pat down and not sufficiently serious" (Doc. 48 at 11 (internal quotation marks omitted)), conducted for the purpose of "ensur[ing] that [Russell was] not diverting Suboxone for illicit use in [SSCF]" (*id.* at 12). Scott further argues that Russell's alleged injuries as a result of the pat down, including a "red mark" around Russell's penis for about a day and a "rug burn" on Russell's penis that hurt for about a week and then began scabbing, were not "sufficiently serious." (*Id.* (internal quotation marks omitted).)

"To be sure, prison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches." *Crawford*, 796 F.3d at 258. But those searches must be done for legitimate penological purposes and not for the purpose of sexually gratifying prison officials or humiliating inmates. *Id. Crawford* explained the distinction:

> Indeed prison security and safety may require frequent searches of an intensely personal nature—and not every such search is properly the subject of a lawsuit. Searches that do not uncover contraband may be no less penologically justified than those that do. And even an officer who is meticulous in conducting a search does not violate an inmate's constitutional rights *as long as the officer had no intention*

---

[7] As noted above, Scott testified that he does not recall coming into contact with Russell's person in any way when he seized Russell's hat. He also denied reaching down and grabbing Russell's penis. (*See* Doc. 48-5 (Ex. C), Scott depo., at 19:15–21.)

*of humiliating the inmate or deriving sexual arousal or gratification from the contact. But a search may not be undertaken maliciously or for the purposes of sexually abusing an inmate.*

*Id.* (emphasis added). "[N]o amount of gratuitous or sexually-motivated fondling of an inmate's genitals—even if limited in duration or conducted through the inmate's clothes . . .—is permitted by the Constitution." *Id.* (citing *Boddie*, 105 F.3d 857); *see id.* at 257 (holding that a corrections officer's "intentional contact with an inmate's genitalia" violates the Eighth Amendment if it "serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate"); *Harris v. Miller*, 818 F.3d 49, 61 (2d Cir. 2016) ("We would . . . almost certainly find a constitutional violation for a search that objectively appears to have been conducted solely to gratify the sexual desires of the officer."). Therefore, if there is evidence indicating that Scott's contact with Russell's penis was undertaken to sexually arouse or gratify Scott or to humiliate Russell, the case must proceed past summary judgment. *See Shepherd*, 2017 WL 666213, at *18 ("Even if each pat frisk, if properly conducted, could have served a valid penological objective, the alleged aggressive squeezing and fondling of Plaintiff[']s genitalia, combined with the accompanying threats of sexual violence or retaliation, would allow a reasonable factfinder to find that the corrections officers lacked a penological purpose and intended to sexually gratify themselves, to humiliate Shepherd, or both.").

Russell contends that Scott's handling of Russell's penis was "not about a search for contraband" but rather "was about satisfying [Scott's] base impulses" (Doc. 49 at 2); and that even if Scott's initial suspicion about Russell diverting medication was reasonable, Scott's pat search of Russell's genitalia was done "to degrade and punish" Russell (*id.* at 6). (*See* Doc. 49-1, Plaintiff's Statement of Disputed Material Facts, at 8–9, ¶¶ 35–36.) Russell's evidence, primarily consisting of his own deposition testimony and interrogatory responses, states in relevant part:

- An inmate had not blocked Scott's vision of Russell during the medication check, and therefore, Scott did not suspect that Russell had improperly diverted medication. (*See* Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 100:20–23 (stating that it "is complete utter crap" that "somebody was . . . in [Scott's] way of seeing me" during medication check, and that Scott merely "used that as probable cause to start all of this"); Doc. 49-6 (Ex. 4), Russell Resp. to Interrogs., at 4 ("There was no reason to suspect that Mr. Russell had secreted medication on his person[,] and there has never been any claim that Mr. Russell did anything else wrong.").)

- Even assuming an inmate had blocked Scott's vision of Russell during the medication check, there was no reason for Scott to subject Russell to a pat search of his genitals, given that (a) Russell passed a mouth check after the inmate had allegedly blocked Scott's view of Russell (*see* Doc. 48-5 (Ex. C), Scott depo., at 15:1–9; Doc. 48-12 (Ex. J), 2/19/19 Incident Hearing Report, at 2); and (b) Scott seized and searched Russell's hat, where Scott claims he found the contraband (*see* Doc. 48-5 (Ex. C), Scott depo., at 19:6 ("I reached over and removed [Russell's hat] from his waistband"), 19:22–20:15 (Scott stating he found "crushed medication" in Russell's hat); Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 35:2–5 (Russell stating, "[t]he hat was in my waistband," and Scott "had the power of taking the hat in the beginning so none of this would have happened")).

- Instead of conducting a routine pat down of Russell, Scott reached inside Russell's sweatpants with his bare hands; and squeezed, yanked, and twisted Russell's penis, in front of other inmates, to the point of causing Russell a great deal of pain and humiliation. (Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 34:5–12, 36:2–3, 13–17, 41:2–42:24; Doc. 49-6 (Ex. 4), Russell Resp. to Interrogs., at 2; Doc. 49-8 (Ex. 6), Bedard Aff., at 2 ("I . . . clearly s[aw] CO Scott[']s hand go into Mr. Russell's pants and grop[]e[] his penis in wh[at] looked like CO Scott [s]q[u]eezed Mr[.] Russell[']s Manhood!"); Doc. 49-9 (Ex. 7), Tarbell Aff., at 3 ("I . . . clearly s[aw] C.O. Scott[']s hand go into Russell[']s pants and grop[]e[] his penis in wh[at] look[ed] like C.O. Scott squeezed Mr[.] Russell[']s Manhood.").)

- After handling Russell's penis, Scott said, "How'd you like that, Mother Fucker?." (Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 89:4–5; *see* Doc. 49-6 (Ex. 4), Russell Resp. to Interrogs., at 2, 5; Doc. 49-8 (Ex. 6), Bedard Aff., at 3 and Doc. 49-9 (Ex. 7), Tarbell Aff., at 4 (inmates Bedard and Tarbell stating they saw Scott "whisper something" to Russell after alleged sexual assault).)

- After the sexual assault occurred and Scott stated, "How'd you like that" to Russell, Scott slammed a heavy metal door on Russell's arm, causing injury to Russell. (*See* Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 90:10–24; Doc. 49-6 (Ex. 4), Russell Resp. to Interrogs., at 2; Doc. 49-8 (Ex. 6), Bedard Aff., at 3 and Doc. 49-9 (Ex. 7), Tarbell Aff., at 4 (inmates Bedard and Tarbell stating they saw Scott "forcefully shut the door" on Russell, "hitting his body somewhere," after the incident).)

As further evidence of the gratuitous or sexually motivated nature of Scott's handling of

Russell's genitals, Russell claims that the pat search was unnecessary. According to Russell,

although Scott has stated that he believed the diverted medication was in Russell's hat, Scott

conducted the pat search of Russell *after Scott already had Russell's hat in his possession*,

making the pat search unnecessary.  (*See* Doc. 49 at 8 ("Since [Scott] had already obtained

possession of the hat, [his] subsequent actions were not rationally related to any legitimate

governmental objective."); *id.* at 4 (citing Doc. 49-1 at 8, ¶ 35 (citing Doc. 49-4 (Ex. 2), Russell

cont'd. depo., at 32–35; Doc. 48-17 (Ex. O), Russell Resp. to Interrogs., at 2; Doc. 49-8 (Ex. 6),

Bedard Aff.; Doc. 49-9 (Ex. 7), Tarbell Aff.)).)

　　　　Russell's own statements at his deposition, however, are inconsistent with this claim.

Russell testified: "[Scott] didn't say give me your hat first[,] *[h]e was reaching first, bypassed

the hat completely*, and now he's touching the shaft of my private area with his bare hands"

(Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 35:25–36:2 (emphasis added)); and, "on the way

out, *after touching me, then [Scott] grabbed the hat*, because he knew it was close by and that he

could use it to try to twist what he did[,] *[t]hen he took the hat*" (*id.* at 37:3–6 (emphases

added)).  Likewise, in each of Russell's grievance forms to the DOC, he alleged that Scott

groped him *and then* grabbed his hat.  (*See, e.g.*, Doc. 48-10 (Ex. H), 2/12/19 Offender/Inmate

Grievance ("<u>after</u> [Scott] was done violating me[,] he pulled my hat out of my wai[s]t"); Doc.

48-13 (Ex. K), 2/27/19 Decision Appeal to Corrections Executive ("Scott squeezed my penis and

then went to reach for my hat," "[Scott] grabbed my hat first <u>after</u> he sexually assaulted me"),

Doc. 48-14 at 1 ("<u>[a]fter</u> the sexual assault[, Scott] then . . . tr[ied] [to] cover up his actions by

after reaching for my hat").)  Consequently, given Russell's inconsistent statements on when

Scott touched Russell's genitals relative to the seizure of the hat, the Court cannot conclude that

Scott's alleged handling of Russell's penis was gratuitous or sexually motivated  *See Di

Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 201 n.45 (S.D.N.Y. 2009) ("It is well

settled that a party may not create a material issue of fact by disputing his own prior sworn testimony.").

The Court also does not accord any weight to Russell's testimony regarding the DOC procedure Scott was required to follow if Scott suspected Russell of possessing contraband; namely, calling a supervising officer who would then, accompanied by another officer, escort Russell to a cell where the officers would strip search[8] Russell. (*See* Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 52:1–53:2.) Russell has not produced a DOC directive or policy to support this testimony, and there is no evidence before the Court supporting the claim that Scott or another corrections officer should have subjected Russell to a strip search upon suspicion that he was diverting medication during the medication check. To the contrary, Scott has produced evidence demonstrating that there is a DOC policy[9] permitting department staff to conduct a pat search of a detainee "at any time," including when a corrections officer suspects a detainee of diverting medication. (*See* Doc. 48 at 18 (quoting State of Vermont Agency of Human Services Department of Corrections, Policy #409.01, at 3 (effective 9/1/15), https://outside.vermont.gov/dept/DOC/Policies/Searches%20Directive.pdf).)

Nevertheless, Russell has come forward with other evidence, cited above, which is sufficient to withstand summary judgment on his claim that Scott's handling of Russell's penis was gratuitous, sexually motivated, or done to humiliate Russell. Courts in this Circuit have denied summary judgment in similar factual circumstances. *See, e.g.*, *Aigbekaen v. Warden*, No.

---

[8] "A 'strip search' occurs when a suspect is required to remove his clothes." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013).

[9] The Court takes judicial notice of DOC Policy #409.01 because its accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2) (stating that a court may take judicial notice of a fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Cameron v. Menard*, Civil Action No. 5:18-cv-204-gwc-jmc, 2019 WL 4675500, at *5 (D. Vt. Aug. 13, 2019) (taking judicial notice of DOC administrative directive), *report and recommendation adopted*, 2019 WL 4674821 (Sept. 25, 2019); *Adorno v. Semple*, CASE NO. 3:16-cv-325 (MPS), 2016 WL 7469709, at *6 (D. Conn. Dec. 28, 2016) (same).

3:21-cv-01526 (JAM), 2023 WL 1780390, at *3 (D. Conn. Feb. 6, 2023) (allowing Eighth

Amendment claim to proceed, where prison official "would stop [inmate] for no reason, and grab

and hold [inmate's] penis while stating 'let me see how the stick is doing today'" (internal

quotation marks omitted)); *Vazquez v. City of New York*, 1:21-cv-01573 (PAE) (VF), 2022 WL

2704763, at *16–17 (S.D.N.Y. June 17, 2022) (holding allegations of sexual abuse plausibly

gave rise to Eighth or Fourteenth Amendment violation, where legal coordinator at prison

persistently made offensive comments to plaintiff pretrial detainee or prisoner, behaved in a

sexually derogatory manner towards plaintiff, and for no legitimate reason grabbed and fondled

plaintiff's genitals and then laughed when he had erection), *report and recommendation adopted*,

2022 WL 2704469 (July 11, 2022), *and report and recommendation adopted*, 2022 WL

17370156 (Dec. 2, 2022); *DeJesus v. Malloy*, 531 F. Supp. 3d 650, 664 (W.D.N.Y. 2021) ("[N]o

rational jury could conclude that there was a penological purpose associated with [d]efendant

reaching inside [p]laintiff's pants, grabbing and squeezing his genitalia, causing [p]laintiff pain,

and stating 'you like that freak' as he performed a pat frisk."); *Houston v. Coveny*, Case # 14-

CV-6609-FPG, 2020 WL 1151345, at *3–4 (W.D.N.Y. Mar. 9, 2020) (where inmate "insist[ed]

that . . . pat frisk involved the squeezing of his genitals and that [d]efendant said 'I'm going to

fuck you' while frisking him," and defendant claimed pat frisk was conducted "in a professional

and thorough manner without squeezing [inmate's] genitals to search for contraband," court

found triable issues of fact and thus denied motions for summary judgment on inmate's sexual

abuse claim), *on reconsideration in part*, 2020 WL 2494439 (May 14, 2020); *Jackson v.

Mastrangelo*, 405 F. Supp. 3d 488, 492 (W.D.N.Y. 2019) (holding plaintiff stated Fourth

Amendment sexual misconduct claim where police officer, during course of seizure, forcibly

reached down plaintiff's pants, yanked his penis, stated "I got you by the balls now," and asked

plaintiff how he liked it); *Gilliam*, 2019 WL 3716545, at *10 (finding sufficient facts alleged to

suggest manual body cavity search of pretrial detainee's rectum in search of pill was done for purpose of humiliating detainee or causing him pain rather than for a legitimate penological purpose, and thus met subjective requirement of sexual abuse claim under Eighth Amendment); *Yunus v. Jones*, 9:16-CV-1282 (GTS/ATB), 2019 WL 5196982, at *9–12 (N.D.N.Y. June 21, 2019) (denying summary judgment because a reasonable jury could conclude that defendants' actions during pat frisks, where they stuck fingers into plaintiff's rectum and threatened to rape him using racially charged terms, were not good faith efforts to maintain discipline), *report and recommendation adopted*, 2019 WL 4010260 (Aug. 26, 2019); *Shepherd*, 2018 WL 3122053, at *3 (finding sufficient evidence for jury to return verdict for inmate on sexual assault claim against corrections officer, where "unwarranted intrusion into [inmate's] private parts was accompanied by an explicit threat of rape, . . . was followed by mocking as [inmate] sought help[,] . . . [and] caus[ed] a sharp pain and lingering psychological effects [to inmate]"); *Granger v. Santiago*, Case No. 3:19cv60(MPS), 2019 WL 1644237, at *2, 7 (D. Conn. Apr. 16, 2019) (finding search was done for purpose of humiliating pretrial detainee rather than for legitimate penological purpose and thus was sufficient to state Eighth Amendment claim, where, after detainee admitted to swallowing drugs and refused to submit to strip search, jail official slammed detainee on floor and forcefully entered his rectum with a gloved hand while smirking); *see also Washington v. Hively*, 695 F.3d 641, 642, 643 (7th Cir. 2012) (reversing grant of summary judgment where pretrial detainee alleged a guard "spent five to seven seconds gratuitously fondling [his] testicles and penis through [his] clothing and then while strip searching him fondled his nude testicles for two or three seconds," and holding that "[a]n unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant.").

Resolving all ambiguities and drawing all factual inferences in favor of Russell, the facts in this case—namely a corrections officer grabbing, squeezing, and twisting a pretrial detainee's penis for no legitimate law enforcement purpose, in front of other detainees/inmates, to the point of causing considerable pain and humiliation to the detainee, followed by the officer making a degrading comment to the detainee and slamming a door on him—contrast with those post-*Crawford* cases where courts have found the conduct at issue to be incidental to a "run-of-the-mill pat down" and thus insufficient to support an Eighth Amendment claim. *Cole v. Suffolk Cnty. Corr. Facility*, 20-cv-1883 (BMC) (AYS), 2020 WL 2113205, at *4 (E.D.N.Y. May 4, 2020) (dismissing Eighth Amendment claim because two instances of officer groping inmate's genitals were not "particularly lengthy or violent" and were "too similar to the type of incidental contact accompanying a run-of-the-mill pat down to reasonably infer any inappropriate touching or malicious intention"); *see Carzoglio v. Abrams*, 18-CV-04198 (PMH), 2022 WL 2193376, at *8 (S.D.N.Y. June 17, 2022) (dismissing Eighth Amendment claim that was based on corrections officer groping of inmate's buttocks for "no more than three seconds on two different occasions" during appropriately ordered pat frisks); *Lynch*, 2022 WL 866745, at *12, 13, 14 (granting summary judgment against pretrial detainee where corrections officer's "routine pat search" of detainee was "undisputedly warranted," supported by "a legitimate penological basis," and caused no pain or other injury to detainee other than humiliation and shame, despite search including officer "rubb[ing] [detainee's] chest and squeez[ing] his right buttock for between five to ten seconds"); *Vann v. Sudranski*, 16 CV 7367 (VB), 2020 WL 3001072, at *6 (S.D.N.Y. June 4, 2020) (no Eighth Amendment claim where corrections officer made only brief contact with inmate's fully clothed genital area during "routine and necessary pat frisk" to search for contraband); *Washington v. Piper*, 18 CV 7783 (NSR), 2019 WL 6343516, at *5 (S.D.N.Y. Nov. 26, 2019) ("Plaintiff's bare allegations of a poke to the groin while he was . . . inside . . . his

housing unit fail to assert sufficient facts" to establish "an act which is sufficiently severe and serious" under the Eighth Amendment); *Dozier v. Franco*, 17-cv-3348 (NSR), 2018 WL 3094935, at *3 (S.D.N.Y. June 22, 2018) (no Eighth Amendment claim where inmate alleged "a single incident that took place during a routine pat frisk to which all inmates were subjected on their way to the . . . recreation area," and where inmate failed to allege "facts that would demonstrate that the conduct was undertaken to humiliate him or to sexually gratify [corrections officer]") (internal quotation marks omitted)).

Scott argues on the one hand that he did not conduct a pat search of Russell (*see* Doc. 48 at 3; Doc. 48-5 (Ex. C), Scott depo., at 19:15–21 (denying that he "reached down and grabbed [Russell's] penis")), and on the other hand that even if he did, the search "was incidental to a legitimate pat down and not sufficiently serious" (Doc. 48 at 11 (internal quotation marks omitted)).  Scott invites the Court to disregard Russell's deposition testimony and instead rely on Scott's factual recitation of the incident (though he continues to deny that the incident even occurred, in relevant part).  But courts are precluded from "reconciling the conflicting versions of the incident and viewing the evidence in favor of defendants" at the summary judgment stage of a case.  *Randolph v. Griffin*, 816 F. App'x 520, 523 (2d Cir. 2020).  Moreover, "as a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010); *see Randolph*, 816 F. App'x at 523 ("[D]istrict courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." (internal quotation marks omitted)); *Adamson v. Miller*, 808 F. App'x 14, 17 (2d Cir. 2020) (vacating district court order granting summary judgment on excessive force claim where plaintiff inmate/detainee's deposition testimony and statements in affidavit, "although not corroborated by other evidence, w[ere] not contradictory

and incomplete, nor w[ere they] so replete with inconsistencies and improbabilities that no reasonable juror could credit [them]," and stating that, "[b]y omitting [plaintiff's] own testimony from its analysis, the district court failed to view the evidence in the light most favorable to [plaintiff] and to favor [him] with all reasonable inferences" (last alteration in original) (internal quotation marks omitted)); *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) ("Although [inmate/detainee's] evidence may be thin, his own sworn statement is adequate to counter summary judgment in this case . . . .").

The credibility of Russell's and Scott's descriptions of what occurred are questions for the jury. *See Harris*, 818 F.3d at 60, 62 (vacating order granting summary judgment, noting that "[i]t is difficult to assess [officers'] justification" for search "because they provided no evidence controverting [inmate's] description of events [and] instead . . . provided in their briefs a blanket denial that the search ever occurred and, in the alternative, a vague justification, assuming the search occurred as [inmate] describe[d]"; and thus "it is unclear from the record, viewed in the light most favorable to [inmate], why the visual body cavity search was conducted in such a violent and forceful manner," and "there are at least disputes of fact concerning whether the search occurred and [the officers'] justification [for that search]"); *Washington*, 695 F.3d at 644 ("We don't see how the defendant's conduct if correctly described by the plaintiff could be thought a proper incident of a pat down or search, and the defendant doesn't contend that it could be; his defense rather is that his conduct has been misdescribed.").

Accordingly, under the Eighth Amendment analysis in *Crawford*, I find that there are triable issues of material fact as to whether Scott reasonably believed Russell was diverting medication and thus whether Scott's alleged contact with Russell's penis was justified by a legitimate penological or law enforcement purpose. Moreover, even if the Court could find that Scott had a legitimate reason to pat search Russell based on reasonable suspicion that Russell

was attempting to divert medication, I find that there are triable issues of fact regarding whether the manner in which Scott conducted the search of Russell was reasonable in relation to a governmental purpose, and whether Scott's alleged contact with Russell's penis was gratuitous, sexually motivated, or intended to humiliate. I therefore recommend denying the Motion for Summary Judgment as to Russell's sexual assault claim under an Eighth Amendment analysis.

**b.    Fourteenth Amendment Analysis**

As noted above, some courts have recognized that the *Kingsley* standard for Fourteenth Amendment excessive force claims by pretrial detainees may also apply to claims of sexual abuse by pretrial detainees. *See, e.g.*, *Gilliam*, 2019 WL 3716545, at *10; *Brown v. Flowers*, 974 F.3d 1178, 1182–83 (10th Cir. 2020) (holding that, because sexual abuse of prisoners by guards is a species of an excessive force claim, after *Kingsley*, pretrial detainee bringing such claim is not required to meet subjective element requirement of Eighth Amendment excessive force claim, but rather "must only demonstrate that [guard's] conduct was objectively harmful enough to establish a constitutional violation" (internal quotation marks omitted)). Under that standard, "a pretrial detainee must show *only* that the force purposely or knowingly used against him was *objectively unreasonable*." *Kingsley*, 576 U.S. at 396–97 (emphasis added).

For the same reasons discussed above, Russell's sexual assault claim survives summary judgment under *Kingsley's* Fourteenth Amendment standard because Russell has come forward with evidence demonstrating triable issues of fact regarding the objective reasonableness of Scott's pat search of Russell and the manner in which Scott conducted that search.

Under either the Eighth or Fourteenth Amendment standard of review, I recommend that Scott's Motion for Summary Judgment be denied as to the sexual assault claim.

**III.    Intentional Infliction of Emotional Distress**

To avoid summary judgment on an IIED claim, the plaintiff must establish a genuine

dispute of material fact regarding conduct that (1) was "extreme and outrageous," (2) was

"intentional or reckless," and (3) "cause[d] severe emotional distress." *Baptie v. Bruno*,

2013 VT 117, ¶ 24, 88 A.3d 1212, 1219 (internal quotation marks omitted). "The conduct must

be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community."

*Denton v. Chittenden Bank*, 163 Vt. 62, 66, 655 A.2d 703, 706 (1994) (omission in original)

(internal quotation marks omitted). Of particular relevance in this case, the resulting distress

must be "so severe that no reasonable person could be expected to endure it." *Carnelli v.*

*Karani*, Case No. 2:15-cv-142, 2017 WL 6398183, at *17 (D. Vt. Aug. 21, 2017) (quoting

*Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 57, 644 A.2d 316, 319 (1994)), *aff'd*, 731 F.

App'x 73 (2d Cir. 2018). "The intensity and the duration of the distress are factors to be

considered in determining its severity." *Tansey v. The Landmark Trust (USA)*, No. 77-4-13,

2018 WL 11418479, at *9 (Vt. Super. Aug. 7, 2018) (quoting Restatement (Second) of Torts

§ 46 (1965)). A plaintiff's burden on a claim of IIED is a "heavy one," *Dulude v. Fletcher Allen*

*Health Care, Inc.*, 174 Vt. 74, 83, 807 A.2d 390, 398 (2002) (internal quotation marks omitted);

liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or

other trivialities," *Denton*, 163 Vt. at 66 (internal quotation marks omitted).

Even assuming that Russell has demonstrated a genuine dispute of material fact regarding

whether Scott acted in an intentionally extreme and outrageous manner toward Russell on the

date in question, I find that Russell has failed to demonstrate a genuine dispute of material fact

regarding whether Scott's outrageous conduct caused Russell to suffer emotional distress so

severe that no reasonable person could be expected to endure it. The only evidence presented to

demonstrate that Russell suffered severe emotional distress as a result of Scott's conduct is Russell's own conclusory statements that he suffered "embarrassment, humiliation, and emotional distress" to the same extent that "any similarly situated reasonable person subjected to a similar attack would experience" (Doc. 48-17 (Ex. O), Russell Resp. to Interrogs., at 6), and that "[g]rabbing and twisting an inmate's penis in a room full of other inmates is an action that would be humiliating to any reasonable person (Doc. 49-6 (Ex. 4), Russell Resp. to Interrogs., at 4). (*See also id.* at 5 ("Any reasonable person subjected to . . . an attack [like] Mr. Russell experienced would be emotionally traumatized by it.").) Russell admits that he "has not sought any counseling for the psychological harm he suffered." (*Id.*)

In the absence of any medical records or other evidence to demonstrate the required "severe emotional distress," with the exception of his own conclusory statements, Russell's IIED claim may not proceed. *See Wakefield v. Scott*, Case No. 5:17-cv-115, 2020 WL 13659093, at *10–11 (D. Vt. Oct. 20, 2020) (finding defendant entitled to summary judgment in his favor on plaintiff's IIED claim, where plaintiff failed to present evidence showing she suffered severe emotional distress); *Chester v. Weingarten*, No. 2751005, 2011 WL 10980781, at *14 (Vt. Super. Oct. 24, 2011) (granting summary judgment on IIED claim where there was no evidence that plaintiff suffered severe emotional distress, and plaintiff "did not seek any medical or psychiatric assistance for her distress[] and . . . presented no objectively verifiable indicia of the severity of [her] emotional distress" (internal quotation marks omitted)); *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 408 n.14 (D. Vt. 2009) (finding insufficient to support claim of mental suffering "vague references to . . . psychological and/or emotional trauma" without "medical records, doctors' notes, treating providers' affidavits, or any other piece of evidence in the record to support this assertion" (internal quotation marks omitted)).

Russell has not offered any Vermont caselaw demonstrating a successful IIED claim on similar facts. Russell claims that "[his] own testimony will demonstrate how deeply affected he was by the incident," explaining that his deposition testimony "was emotionally moving and authentic," "[although] the transcript does not reflect [that]." (Doc. 49 at 11.) Without any supporting evidence, however, to demonstrate the severity of the claimed emotional distress, this is insufficient to create a genuine dispute of material fact, particularly given the plaintiff's heavy burden to establish an IIED claim.

Accordingly, I recommend granting Scott's Motion for Summary Judgment regarding the state-law IIED claim.

## IV.   Malicious Prosecution

Russell's malicious prosecution claim arises from Scott's filing of an ultimately unsuccessful disciplinary report against Russell related to the medication pass incident on February 11, 2019. Under Vermont law, a claim for malicious prosecution requires the plaintiff to establish that the defendant instituted a proceeding against him: "(1) without probable cause, (2) with malice, and that (3) the proceeding terminated in [the plaintiff's] favor." *Anello v. Vinci*, 142 Vt. 583, 586–87, 458 A.2d 1117, 1119 (1983); *see Grega v. Pettengill*, 123 F. Supp. 3d 517, 542 (D. Vt. 2015); *Czechorowski v. State of Vermont*, 2005 VT 40, ¶ 30, 872 A.2d 883, 897 (noting a "longstanding recognition that the common law malicious prosecution action represents a viable private analog for claims against the State and public officials arising from the bringing of allegedly unfounded legal proceedings").

Scott contends the malicious prosecution claim fails because "[t]here is no evidence from which a reasonable jury could infer that the disciplinary proceeding was instituted without probable cause" (Doc. 48 at 14), and because "it is undisputed that . . . Scott found what he believed to be Suboxone in [Russell's] hat" (*id.* at 6). Scott further contends that there is no

34

evidence that he instituted the disciplinary proceeding "with malice."  (*Id.*at 15.)  Russell

disagrees, claiming in his Opposition that "there was never any contraband," and that, at least by

the time Scott took possession of Russell's hat, he "would have known that there was no

contraband" and thus had no reason to initiate disciplinary proceedings against Russell.  (Doc. 49

at 12.)  As discussed above, there are triable issues of material fact regarding whether Scott

reasonably believed Russell was diverting medication and whether Scott's alleged contact with

Russell's penis was gratuitous, sexually motivated, or intended to humiliate.  Therefore, these are

issues for the jury to determine after assessing the parties' credibility.

    Although the parties focus on the probable cause and malice elements of the malicious

prosecution claim, the Court finds that the claim fails because Russell cannot show that the prior

proceeding terminated in his favor.  The termination of a prior proceeding in a claimant's favor

is "an essential element of the tort."  *Siliski v. Allstate Ins. Co.*, 174 Vt. 200, 203, 811 A.2d 148,

151 (2002) (internal quotation marks omitted).  A proceeding is "terminated in [the plaintiff's]

favor" for purposes of a malicious prosecution claim only if it can be determined that the

plaintiff is not guilty of wrongdoing.  *See Lay v. Pettengill*, 2011 VT 127, ¶ 33, 191 Vt. 141, 160

(holding that "[p]roceedings are terminated in favor of the accused . . . only when their final

disposition is such as to indicate the innocence of the accused" (alteration and omission in

original) (internal quotation marks omitted)).  In cases where the proceeding terminated due to a

chain-of-custody issue, it cannot be said that the proceeding "terminated in the plaintiff's favor."

This is because in such circumstances it has not been determined that the plaintiff is not guilty of

wrongdoing.  *See, e.g.*, *Layou v. Crews*, No. 9:11–CV–0114 (LEK/RFT), 2013 WL 5494062,

\*13 (N.D.N.Y. Sept. 30, 2013) (finding that plaintiff could not make out a plausible malicious

prosecution claim because his criminal convictions "were not favorably terminated," where they

"were overturned because the evidence was tainted by an unlawful search and seizure, and/or the chain of custody over the evidence could not be established").

There are no triable issues of fact regarding whether the subject disciplinary proceeding terminated due to a chain-of-custody issue.  As Russell testified at his deposition, "the basis of th[e] [Incident Report] getting dropped is because *there was a chain[-]of[-]custody error*[;] . . . this got dismissed because *the chain of custody was broke*."  (Doc. 49-4 (Ex. 2), Russell cont'd. depo., at 21:18–23 (emphases added).)  Scott similarly testified at his deposition that the Incident Report was dismissed because of "chain[-]of[-]custody" issues;, namely, he was "supposed to keep control of [the hat]" but he believed he had "set the hat on the med cart" for approximately ten seconds or less.  (Doc. 48-5 (Ex. C), Scott depo., at 21:6, 9–15.)  Moreover, in his Statement of Undisputed Material Facts, Scott stated: "[Russell] was found not guilty based on *a lack of chain of custody over the alleged contraband* in [Russell's] hat."  (Doc. 48-1, at 4, ¶ 29 (emphasis added).)  The Hearing Officer confirmed the substance of Russell's and Scott's statements, writing in the Hearing Report that Russell was found "not guilty" because there was "*NO chain of custody*."  (Doc. 48-12 (Ex. J), 2/19/19 Incident Hearing Report, at 2 (emphasis added).)

Given that the subject disciplinary proceedings Scott initiated were not "terminated in Russell's favor," I recommend granting Scott's Motion for Summary Judgment regarding the state malicious prosecution claim.

## V.    Assault/Battery

"Under Vermont law, assault is any gesture or threat of violence exhibiting an intention to assault, with the means of carrying that threat into effect . . . unless immediate contact is impossible."  *Barrette v. Vill. of Swanton*, Case No. 2:22-cv-00129, 2023 WL 3891034, at *14 (D. Vt. June 6, 2023) (omission in original) (internal quotation marks omitted).  In Scott's view,

Russell cannot establish a claim for assault because (1) there is no allegation that Scott "threatened any violence"; and (2) it cannot be shown that Scott "exhibited an intention to assault" Russell, given that any contact with Russell's penis was "incident to a reasonable search based on [Scott's] belief that [Russell] was attempting to smuggle medication back into the facility." (Doc. 48 at 16.)

In response, Russell essentially concedes that he has not demonstrated the elements of an assault claim but states that because he "was subjected to *actual* violence and not just threats of violence," his assault claim "may be more appropriately cabined under the related tort of battery." (Doc. 49 at 12 (emphasis added).) He therefore requests "leave to amend the Complaint to rename the tort identified in Count I of [the] Complaint as Battery." (*Id.*) Russell does not provide legal authority permitting the Court to amend the Complaint to substitute one claim for another at this late stage when the Court is recommending a disposition on summary judgment. Nonetheless, the Court may permit the requested amendment where the facts alleged from the start of the case support the new claim and the defendant would suffer no prejudice from substitution of the new claim for the old claim.[10] *See, e.g.*, *Clark v. Abate*, No. S07072009, 2011 WL 10980780, at *1 (Vt. Super. June 30, 2011) ("Although the amended complaint uses the term 'sexual assault' rather than 'battery,' for purposes of a tort claim the underlying facts are the same[; and] [t]he court does not find any prejudice to [the d]efendant based upon what is essentially a change of terminology."); *Rodriguez v. City of New York*, 594 F. Supp. 3d 534, 546 (E.D.N.Y. 2022) (where defendants would not be prejudiced by adding new claim to complaint, and where "parties ha[d] been litigating [claim] as a core claim in th[e] case from the outset," court allowed plaintiff to pursue new claim "by treating the [c]omplaint as amended" (internal

---

[10] Scott does not object to the proposed amendment.

quotation marks omitted)).  I therefore recommend amending the Complaint to substitute a state-law battery claim for the assault claim alleged in Count 1 of the Complaint.  (*See* Doc. 1 at 4, ¶¶ 18–22.)

The tort of battery is "an intentional act that results in harmful contact with another." *Barrette*, 2023 WL 3891034, at *14 (quoting *Christman v. Davis*, 2005 VT 119, ¶ 6, 179 Vt. 99, 101).  When battery is alleged against a police officer, "the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged."  *Meli v. City of Burlington, Vermont*, 585 F. Supp. 3d 615, 635 (D. Vt. 2022) (internal quotation marks omitted); *see Mayo v. Winn*, No. S0952-05CnC, 2009 WL 8103582, at *6 (Vt. Super. May 14, 2009) ("[T]he recognized privilege to batter a suspect during the course of an arrest is limited, and not absolute[; i]t ends when the force used is excessive, which is determined using the same standards used to analyze a Fourth Amendment excessive force claim."); *Tardif v. City of New York*, 991 F.3d 394, 411 (2d Cir. 2021) ("New York courts have dismissed assault and battery claims in non-arrest situations where it was clear from the record that the use of force was justified and reasonable.").

Russell's battery claim essentially duplicates his constitutional excessive force and sexual assault claims.  Therefore, for the same reason that the door-slamming incident cannot sustain a Fourteenth Amendment excessive force claim, it cannot serve as the basis for a claim for battery under Vermont law.  Scott's act of forcibly closing the door as Russell walked through it was reasonably necessary to address the security threat posed by Russell at the time and was therefore privileged.  Accordingly, I recommend granting Scott's Motion for Summary Judgment on the battery claim arising from the door-slamming incident.

Conversely, summary judgment should be denied on the battery claim arising from the allegations of sexual assault.  As explained above, triable issues of fact remain as to the objective reasonableness of (a) Scott's pat search of Russell and (b) the manner in which Scott conducted

that search.  As the battery claim is based on the same conduct as the sexual assault claim, it also should not be disposed of on summary judgment.  *See, e.g.*, *Jok v. City of Burlington, Vermont*, Case No. 2:19-cv-70, 2022 WL 444361, at *9 (D. Vt. Feb. 14, 2022) ("Because [plaintiff's] assault and battery claims, like his excessive force claim, turn on a question of reasonableness which considering material disputed facts should be left to the jury, the Court denies summary judgment on [plaintiff's] assault and battery claims."); *Bombard v. Volp*, 44 F. Supp. 3d 514, 526 (D. Vt. Sept. 8, 2014) (where plaintiff's battery claims "essentially duplicate[d]" his excessive force claims, and where "the questions of excessive force and reasonableness [we]re matters for the jury," court could not grant summary judgment on battery claims); *Thomas v. City of New York*, 17-CV-8593 (JPO), 2020 WL 6712306, at *8 (S.D.N.Y. Nov. 16, 2020) ("Because [p]laintiffs' constitutional claims regarding [d]efendant['s] . . . searches survive summary judgment, so too must the sexual assault and battery claims.").

For these reasons, I recommend denying Scott's Motion for Summary Judgment on the battery claim arising from Scott's alleged sexual assault of Russell.

## VI.    Qualified Immunity

Scott contends that qualified immunity shields him from liability on all claims because (1) Russell has failed to establish that Scott's conduct violated any clearly established right; and (2) even if there was such a clearly established right, it was objectively reasonable for Scott to believe that his actions did not violate any such right.  (*See* Doc. 48 at 16–18.)  Russell counters that qualified immunity is not available to Scott because it has been clearly established since the Second Circuit's 2015 *Crawford* decision that "*any* gratuitous fondling of an inmate's genitalia violates the Constitution."  (Doc. 49 at 10.)

The doctrine of qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established

at the time of the challenged conduct.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "The

doctrine aims to balance 'the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when

they perform their duties reasonably.'" *Horn v. Stephenson*, 11 F.4th 163, 169 (2d Cir. 2021)

(quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A right is "clearly established" if, at

the time of the challenged conduct, it was "sufficiently clear that every reasonable official would

[have understood] that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (alteration

in original) (internal quotation marks omitted). As "clearly established law" is determined with

reference to the facts of the case in which the defense is raised, courts may not define clearly

established law at a high level of generality. *Horn*, 11 F.4th at 169. This standard ensures that

the defendant-official had fair warning that his or her actions were unlawful. *Id.* Nonetheless,

the plaintiff need not produce a case directly on point to demonstrate a clearly established right;

it is only necessary to demonstrate that "existing precedent . . . placed the statutory or

constitutional question beyond debate." *Id.* (omission in original) (quoting *Ashcroft v. al-Kidd*,

563 U.S. 731, 741 (2011)). In identifying "existing precedent," courts consider "Supreme Court

or Court of Appeals case law" that existed at the time of the alleged violation. *Terebesi v.

Torreso*, 764 F.3d 217, 231 (2d Cir. 2014).

At summary judgment, the court evaluates claims of qualified immunity using a two-part

inquiry: "(1) whether the facts, taken in the light most favorable to the party asserting the injury,

show the officer's conduct violated a federal right[,] and (2) whether the right in question was

clearly established at the time of the violation." *Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir.

2019) (internal quotation marks omitted). Qualified immunity is an affirmative defense, and "the

burden is on the defendant-official to establish it on a motion for summary judgment." *Bailey v.

Pataki*, 708 F.3d 391, 404 (2d Cir. 2013). A defendant is entitled to summary judgment on

qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[] to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987) (alteration in original) (internal quotation marks omitted). Summary judgment based on qualified immunity "requires that no dispute about material factual issues remain." *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998); *see Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003) ("Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail."). When considering qualified immunity at the summary judgment stage, as with other issues on summary judgment, courts must "construe all evidence and draw all reasonable inferences in the non-moving party's favor." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (internal quotation marks omitted).

Because I recommend granting summary judgment on the merits of Russell's Eighth Amendment claim and Fourteenth Amendment excessive force claim, as well as on Russell's state-law IIED and malicious prosecution claims, I do not reach the issue of Scott's qualified immunity as to those claims. *See, e.g.*, *Farrell v. Burke*, 449 F.3d 470, 499 n.14 (2d Cir. 2006) ("Because we have found no cognizable violation of [plaintiff's] rights in this case, we need not reach the question of qualified immunity."); *Casiano v. Ashley*, 515 F. Supp. 3d 19, 26–27 (W.D.N.Y. 2021) (noting that court's finding that jail officials did not use excessive force "renders it unnecessary for the [c]ourt to address [officials'] qualified immunity defense").

Regarding the sexual assault claim, the issues of fact that preclude summary judgment on this claim also preclude application of qualified immunity at this stage. If Russell's account of the facts is true, there was no penological justification for Scott's pat frisk of Russell's genitals.

41

Therefore, Scott's conduct would violate clearly established law and he would not be entitled to qualified immunity. Moreover, even assuming Scott reasonably believed Russell was attempting to divert contraband and reasonably determined that it was necessary to conduct a pat frisk of Russell's genitals in search of the contraband, no reasonable corrections officer could have believed at the time that grabbing, squeezing, and twisting a pretrial detainee's penis to the point of causing a great amount of pain and embarrassment to the detainee, and then stating "How'd you like that, mother fucker?," was a reasonable manner in which to conduct a pat search of a pretrial detainee for suspected contraband.

As discussed above, in *Crawford* the Second Circuit established that "the sexual abuse of prisoners . . . offends our most basic principles of just punishment," an observation that built on the Second Circuit's previous explanation that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie*, 105 F.3d at 860–61. In *Crawford*, as in this case, a corrections officer's pat frisk of an inmate involved the officer squeezing and fondling the inmate's penis and making demeaning comments of a sexual nature. The court found that the officer had violated the inmate's constitutional rights, particularly because the officer's comments "suggest[ed] that [the officer] undertook the search in order to arouse himself, humiliate [the inmate], or both." *Id.* at 259. If Russell's version of the events is accepted, the facts in this case are similar to *Crawford*, and thus Scott's alleged conduct was clearly established as unconstitutional. *See Ullery v. Bradley*, 949 F.3d 1282, 1300 (10th Cir. 2020) (citing *Crawford* and holding that "Defendant violated clearly established Eighth Amendment law by: (1) approaching [p]laintiff from behind and forcibly pressing his genitals into her buttocks while lasciviously moaning 'mmmmmm' in her ear; (2) purposefully and knowingly using physical force against [p]laintiff by touching her breasts; and (3) forcibly grabbing and fondling [p]laintiff's crotch without her consent[; and

that], based on the consensus of persuasive authority addressing the right in question, any one of these three uses of force on its own—regardless of whether [p]laintiff's allegations are viewed in isolation or as a pattern of pervasive sexual abuse—violated clearly established law").

If, however, Scott's belief that Russell was diverting contraband was reasonable and thus there was a legitimate penological purpose for the pat search, and Scott's conduct was not as intrusive or gratuitous as Russell describes, then qualified immunity may apply. Either way, genuine factual disputes preclude a determination on summary judgment as to whether qualified immunity shields Scott from Russell's sexual assault claim. *See Franco v. Gunsalus*, 972 F.3d 170, 174 (2d Cir. Aug. 28, 2020) ("Where . . . there remains a genuine factual dispute, the existence of qualified immunity cannot be determined until the factual dispute is resolved."); *Ellington v. Whiting*, 807 F. App'x 67, 69 (2d Cir. 2020) ("Applying th[e summary judgment] standard, there are several disputed factual issues which prevent resolution of the defendants-appellants' qualified immunity defense at this time."); *cf. Jackson v. Downstate Corr. Facility*, 16-CV-267 (NSR), 2020 WL 7630351, at *10 (S.D.N.Y. Dec. 22, 2020) (in excessive force case, holding that "[b]ecause there is a dispute of material fact over whether [inmate] was noncompliant with a reasonable order and whether any force was used on [inmate] at all, the [c]ourt cannot determine at the summary judgment stage whether [corrections officers] are entitled to qualified immunity")).

Regarding Russell's battery claim, "the substantive law of Vermont governs the applicability of qualified immunity to [this] state law claim[]." *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Under Vermont law, lower-level government employees like Scott "are immune from tort liability when they perform discretionary acts *in good faith* during the course of their employment and within the scope of their authority." *Stevens v. Stearns*, 2003 VT 74, ¶ 15, 833 A.2d 835, 840 (emphasis

added) (internal quotation marks omitted). The "good faith" inquiry does not ask whether the plaintiff's rights were violated, but rather, whether an official's acts "violate[d] clearly established rights of which the official reasonably should have known," i.e., "whether the official reasonably should have known that what she was doing violated [the] plaintiff's rights." *Id.* To the extent that the battery claim depends on Scott's allegation that there was a legitimate penological purpose for his handling of Russell's genitals, for the reasons stated above, there are triable issues of material fact that preclude a determination on summary judgment regarding a qualified immunity defense to the claim.

Accordingly, factual issues preclude summary judgment in favor of Scott on the basis of qualified immunity with respect to Russell's sexual assault and battery claims.

## Conclusion

For these reasons, I recommend GRANTING Scott's Motion for Summary Judgment (Doc. 48) with respect to the Eighth Amendment claim, the Fourteenth Amendment excessive force claim, and the state-law IIED and malicious prosecution claims. I recommend DENYING the Motion with respect to the constitutional sexual assault claim. I further recommend permitting amendment of the Complaint to substitute a state-law battery claim for the assault claim (*see* Doc. 1 at 4, ¶¶ 18–22), and DENYING the Motion with respect to the battery claim. If the Court adopts this Report and Recommendation, only the constitutional sexual assault claim and the battery claim will proceed.

Dated at Burlington, in the District of Vermont, this 10th day of April 2024.

*/s/ Kevin J. Doyle*
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).